UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Cleveland Fire Fighters For Fair Hiring Practices, et al., | ) ) ) | CASE NO.: 1: 00 CV 301 CASE NO.: C73-330 |
|         Plaintiffs, | ) ) | |
| v. | ) ) | |
| City of Cleveland, et al., | ) ) | |
|         Defendants. | ) ) | |
| _____ | ) ) | MEMORANDUM OPINION AND ORDER |
| Lamont C. Headen, et al., | ) ) | |
|         Plaintiffs, | ) ) | |
| Vanguards of Cleveland, | ) ) | |
|         Intervenor Plaintiffs, | ) ) | |
| v. | ) ) | |
| City of Cleveland, et al., | ) ) | |
|         Defendants. | ) | |

This matter is before the Court on Defendant the City of Cleveland's Motion for

Extension of Time to Comply with the *Headen* Decree.  (ECF # 44.)  Also before the Court is a

Motion to Extend the Terms of the Second Amended Consent Decree filed by the Vanguards of

Cleveland.  (ECF # 45.)   For the reasons set forth below, the Motions are DENIED.

## I. BACKGROUND

This case began long ago on April 3, 1973, when Plaintiffs Lamont C. Headen, Sherman

E. Kitchen, Jerry L. Lett and Harned R. Gaitor brought an action against Defendants the City of

Cleveland, Mayor Ralph J. Perk, Safety Director James T. Carney, Fire Chief William E. Barry,

Police Chief Gerald Rademaker, the Civil Service Commission of the City of Cleveland, and the

following members of the Civil Service Commission of the City of Cleveland: David Sindell, Walter Burks, Arthur Heard, Marnette Lee and Robert Weissman.  Plaintiffs, black residents of the City of Cleveland who applied for, but were not offered, employment as firefighter in the Cleveland Fire Department,  filed the Complaint as a class action on behalf of themselves and others similarly situated, claiming discrimination in violation of 42 U.S.C. §§ 1981, 1983 and O.R.C. § 4112.02.

In the Complaint, Plaintiffs claimed that Defendants discriminated against applicants for employment with the Cleveland Fire Department on the basis of race, color, and national origin. More specifically, the Complaint provided that, at the time of its filing, blacks accounted for a mere 4% of the firefighters in the City's Fire Department, whereas they accounted for 40% of the population living in the City.  It further contended that no substantial efforts had been made to reach black and hispanic applicants.  The Complaint alleged that the discrimination arose, *inter alia*, because:

(a)     Written tests used as a prerequisite for employment exclude a disproportionately high number of minority applicants for employment as compared to the [w]hite applicants and have not been professionally developed nor validated to establish any predictive validity evidence that the tests measure job performance;

(b)     The background investigation and oral interviews exclude a disproportionately high number of minority applicants for employment as compared to [w]hite applicants because:

(i)     factors are used to deny employment to minority persons which are not related to job performance;

(ii)     arbitrary discretion is vested in the Defendants to decide whether or not to employ an applicant; this arbitrary discretion has been used by the Defendants to deny employment to a high proportion of minority applicants as compared with [w]hite applicants.

2

(c)     The psychological examinations are conducted by means of a written examination which discriminates against minority applicants and which fails to take into account the differing cultural experiences of minority applicants as compared to [w]hite, largely middle-class applicants.  Individuals are eliminated for "psychological" reasons which are not job related.

(d)     The medical examination excludes a disproportionately high number of minority applicants for reasons not related to the medical and physical requirements of the job of fireman.

On this basis, Plaintiffs requested equitable relief and monetary damages.  Plaintiffs later filed an Amended Complaint and a Second Amended Complaint, adding that the Safety Director improperly used a device known as the "one in three" rule to refuse employment, and maintaining their allegations of discrimination in violation of 42 U.S.C. §§ 1981, 1983 and O.R.C. § 4112.02.

On April 25, 1975, after a hearing consisting of evidence and written and oral statements of counsel, the Honorable Robert B. Krupansky made the following findings:

IT APPEARING to the Court that the entrance examination heretofore administered by the Defendants to candidates for the position of firefighter with the City of Cleveland Fire Department was an examination identical to the examination heretofore administered to candidates for the position of patrolman and patrolwoman; and it further appearing that this identical patrolman's examination was judicially determined to be in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution by the Honorable William K. Thomas in the case of *Shield Club v. City of Cleveland, et al.*, Civil Action No. C72-1088, United States District Court for the Northern District of Ohio, Eastern Division;

IT FURTHER APPEARING that the within action was filed on April 3, 1973 and that the Defendant Civil Service Commission has failed since April 6, 1973 to exercise diligent efforts to develop a new job-related entrance examination for the position of firefighter; and

IT FURTHER APPEARING that the remaining issues concerning the selection of firefighters for the City of Cleveland Fire Department are intimately interwoven as a practical matter with the administration of the entrance examination; and that said related issues bear a similar likeness to the issues fully litigated and

3

determined by the Honorable William K. Thomas in the aforementioned case of *Shield Club, et al. v. City of Cleveland*;

       NOW IT IS THEREFORE ORDERED THAT:

       The Defendants and each of them, their agents, employees and all persons in action, concert or participation with them shall refrain from appointing any new firefighters to the Cleveland Fire Department until such time as there is presented to this Court, and approved by this Court:

1.     An entrance examination which is demonstrably job-related in a manner consistent with EEOC Guidelines on Employment Selection Procedures;

2.     A plan for the concentrated recruitment of minority candidates to take such examination, and all subsequent examinations;

3.     A method whereby residents of the City of Cleveland shall be awarded bonus points for their residency on all future examinations in the same manner as is presently being done for the Cleveland Police Department;

4.     Revised screening procedures (background, psychological, psychiatric, etc.) such as are job-related, objective and non-discriminatory, to be utilized as part of all future entrance examinations for the Fire Department.

       IT IS FURTHER ORDERED that following the development of, and approval by the Court of a new entrance examination, that all subsequent examinations shall be demonstrably job-related in a manner consistent with the EEOC Guidelines on Employment Selection Procedures.

*Headen v. City of Cleveland*, No. C73-330 (N.D. Ohio Apr. 25, 1975.)  Hence, Judge Krupansky

found that the City had unlawfully discriminated against minorities in the hiring of firefighters.

*Id.*

     As a result of the April 25, 1975 Order, the parties entered into a Consent Decree,

requiring the City to implement specific procedures for the recruitment and the hiring of

minorities to remedy the effects of the past discrimination.  (ECF # 45, Ex.1 at 2.)  They did so

after the case was transferred to the docket of the then newly-appointed Judge John M. Manos in

1976.  Judge Manos approved and adopted the Consent Decree on January 17, 1977 (the "1977

4

Consent Decree"). (*Id.*)

Some time thereafter, the Vanguards of Cleveland (the "Vanguards"), an organization of black and hispanic firefighters employed by the City, were made parties to the litigation and participated in the effort to recruit and tutor minority firefighter candidates.  (*Id.*)  In 1984, the Vanguards filed a Motion to Modify the 1977 Consent Decree.  (*Id.*)  Pursuant to that Motion, the parties entered into an Amended Consent Decree that redefined, but did not expand, the remedial provisions of the 1977 Consent Decree.  The Amended Consent Decree was approved and adopted by Judge Manos on May 21, 1984 (the "Amended Consent Decree").  (*Id.*)

Both the 1977 Consent Decree and the Amended Consent Decree set forth a formula in order to remedy past discrimination.  (*Id.*)  Specifically, the 1977 Consent Decree and Amended Consent Decree provided that the ratio of minorities to non-minorities hired may not be less than the ratio of minorities to non-minorities who passed any given entrance examination (the "*Headen* Ratios").  (*Id.*)

On January 26, 2000, the City filed a Motion to Stay Further Execution of the Amended Consent Decree.  (*Id.*)  Several days later, on February 1, 2000, an organization named the Cleveland Firefighters for Fair Hiring Practices ("CFFHP") brought a lawsuit, captioned *Cleveland Firefighters for Fair Hiring Practices, et al. v. City of Cleveland*, 1:00 CV 301 and consolidated with *Headen v. City of Cleveland*, No. C73-330, challenging the constitutionality of the 1977 Consent Decree and the Amended Consent Decree.  (*Id.*)  In response, the Vanguards defended the validity of the Amended Consent Decree, and argued that the City had continued to engage in discriminatory practices against minorities in the hiring of its firefighters.   (*Id*. at 3.)  The City, in turn, defended its hiring practices.  (*Id.*)

5

On February 2, 2000, Judge Manos denied the City's Motion to Stay.  (*Id.*)  On September 29, 2000, following informal discovery, Judge Manos issued findings that (1) 38.1% of those individuals who met the qualifications to sit for the most recent firefighter examination and who actually took the examination were minorities; (2) as of 2000, only 26% of the City's firefighters were minorities.  (*Id.*)  Based upon those findings, the parties entered into a further modified Consent Decree, which was approved and adopted by Judge Manos on September 29, 2000 (the "Second Amended Consent Decree").  (*Id.* at 4.)

The Second Amended Consent Decree provided, in pertinent part:

1.   The *Headen* decree shall remain in full force and effect until the City of Cleveland Department of Public Safety, Division of Fire, reaches a 33 1/3% minority makeup or until the City has established and hired cadets from three eligible lists, (which shall include the current list originally certified in 1999 and herein referred to as the "1999 Eligible List"), whichever occurs first. Pursuant to Civil Service Rules, eligible lists are valid for two years. However, recognizing the lifespan of three lists and the possible need for some additional administrative time, the City will have three lists (including the 1999 Eligible List which expires in September 28, 2002) established and appointments made therefrom before September 29, 2008.  The parties understand that there may be legitimate circumstances which may prevent the City from establishing and hiring from the two additional eligible lists anticipated herein within the prescribed time.  If the City is unable to establish three lists (including the 1999 Eligible List) and hire therefrom before September 29, 2008, the City may petition the Court for a reasonable extension of time within which to establish the remaining eligible lists and make appointments therefrom during the life of said lists.  Such a petition by the City shall be approved for a reasonable time, provided that the City has made a good faith effort to meet the September 29, 2008 deadline.  The percentage makeup of the Division of Fire shall be computed by determining the percentage of minorities (as defined by the decree) within the uniformed ranks of the Division of Fire, regardless of rank.

2.   The parties agree that they are committed to negotiating and implementing a plan for "reinvigoration of the prior recruitment and training records" for the entry level position of firefighter in a manner which will be focused upon by City residents and to further institute a new component funded by the City of Cleveland which will focus upon teaching high school students to become

skilled in those abilities which are required to perform well on aptitude tests used by civil service commissions with special emphasis on those skills needed to excel in the fire entrance examination administered by the City of Cleveland.  The parties agree that the plan will be substantially in accord with the outline attached hereto as Exhibit C, with the further understanding that, notwithstanding any language currently contained in the *Headen* decree, this program will be made available to students and adults regardless of race, and the City cannot commit to appointing any individuals who will be associated with this program based upon that individual's race or national origin.

The parties agree, based upon this general outline, to negotiate in good faith on the details of this plan.  The parties also acknowledge that educational professionals should be consulted in developing and implementing the plan.  If, by year's end (2000), the parties have not reached a complete agreement regarding this plan, the issue shall be submitted to the Court for resolution.  The incomplete status of this issue shall not affect the agreement of the parties on the remaining terms agreed to in this Second Amended Consent Decree.

If the goal of 33 1/3% has not been met by the expiration of the third eligible list referenced in paragraph one, the parties shall have the right to petition the court on the single issue of continuing the recruitment and training program established by the parties to this paragraph.  The right to petition the court on this sole issue shall not affect the remaining terms agreed to herein.

3.      The parties agree that, for purposes of the 1999 Eligible List, the written component shall be rescored so that a passing score on the written exam shall be 26.5 or two (2) standard deviations below the mean test score.  For future written exams during the life of the decree, the minimum possible passing score shall be two (2) standard deviations below the mean written test score.

For purposes of calculating the composite passing score (*i.e.,* 70%) on the City of Cleveland Civil service examination for purposes of becoming a firefighter, the practice of the Civil Service Commission has been to afford equal weight (*i.e.,* 50% for each) to the PAT (physical agility test) and to the CAT (cognitive ability test) portions of the examination.  During the term of the *Headen* decree, this practice shall remain unchanged.

4.      The City agrees to pay attorneys' fees and expenses to counsel for the plaintiff class, Firefighters for Fair Hiring Practices, in the sum of forty thousand dollars ($40,000).  The matter of fees and expenses for the Vanguards is reserved for consideration by the Court upon application by the Vanguards.  The City reserves the right to oppose said application.

5.      The existing method of assigning seniority to persons on the eligible list shall

be continued during the life of this Second Amended Consent Decree.

6.    For the duration of the *Headen* decree, the Secretary of the Civil Service Commission will notify, in advance, designated representatives of the Cleveland Firefighters for Fair Hiring Practices, Local 93, and the Vanguards, of the date and location of the Commission meeting regarding approval of an eligibility list for firefighters pursuant to this Second Amended Consent Decree.  At this meeting, the City will make available data regarding test scoring, passing applicants, and the calculation of the hiring ratio.  Once the final list is ratified, the Commission received a Final Report from the testing consultant.  The Secretary will forward a copy of this Report to the designated representatives. Prior to any appointments being made from the eligible list, the designated representatives of the Firefighters for Fair Hiring Practices, Local 93, and the Vanguards will be given a fair opportunity to evaluate all relevant data, and if necessary to appeal to the Commission regarding the composition of the eligible list, and if further review is necessary, to petition the Court.  Furthermore, the Commission Secretary shall be available, upon reasonable notice, to further discuss with said designated representatives any issues pertaining thereto.  In addition, the Firefighters for Fair Hiring Practices, Local 93 and the Vanguards shall remain or become parties for the duration of the *Headen* decree, and shall have the right to petition the Court whenever it is believed that the City is not faithfully complying with the dictates of the Decree.

The Secretary of the Civil Service Commission shall also notify representatives from the Firefighters for Fair Hiring Practices, Local 93 and the Vanguards prior to selecting a consultant to develop and administer a fire entrance exam.  Representatives from these groups will be afforded a reasonable opportunity to offer their opinions regarding possible consultants before said selection has been made.

7.    The City is committed to provide vigorous enforcement of the Civil Service Rules in regard to the award of residency points for applicants.

8.    By no later than January 1, 2008, the City shall (with the assistance of qualified testing consultants and input from the Firefighters for Fair Hiring Practice, Local 93, and the Vanguards) have undertaken a reevaluation of the entrance examination process.  Attention shall be paid to the validity of the written and physical examinations and their relative weights and possible alternative methods of selection to insure merit-based hiring and to further insure that testing does not unlawfully discriminate against any applicant based upon race or gender.  Changes, if any, in the entrance examination process shall not be implemented until after the termination of the *Headen* decree in accordance with this Judgment.

8

9.      The plaintiff class will be provided notice of the above agreement by Court
Order.

10.     This agreement is the result of language submitted by all parties.  Proposed
drafts or rejected proposals may not be used to guide the future interpretation
or construction of this second amended consent decree.

11.     The Court shall retain continuing jurisdiction over this second amended
consent decree.

(*Id.* at 4-9.)

This Court was assigned to this case is in September 2008, following the City's Motion

for an Extension of Time to Comply with the *Headen* Decree filed on September 26, 2008.

(ECF # 44.)  In the Motion, the City claims that:

Due to circumstances beyond [its] control it has not reached the 33 1/3% minority
make-up nor been able to establish the second and third eligibility lists.  The City has
every intention of complying with the dictates of the *Headen* decree but numerous
factors have created a "perfect storm" that has made the timely establishment of the
second and third eligibility lists a virtual impossibility.

(*Id.* at 2.)  The factors cited by the City include:

•      November 1998: Fire entrance examination held.

•      September 1999: The 1999 fire eligibility list established.

•      September 2000: Court orders the 1999 Fire eligibility list "reconstituted"
and orders that the *Headen* ratio for hiring be one minority for every two
Caucasians hired.  Court also extends Fire eligibility list until September
2002.

•      October 2000: Fire eligibility list reconstituted as ordered by the Court.

•      October 2000: 74 cadets assigned to the Fire Training Academy.

•      February 2001: 57 cadets assigned to the Fire Training Academy.

•      November 2001: Prospective candidates offered conditional letters of
appointment to participate in the Fire Training Academy.  However, no
Fire Training Academy was held.

9

- September 2002: The 1999 Fire eligibility list expired.

- October 2002: 52 Prospective candidates notified that, despite expiration of eligibility list, the prior conditional offer of employment preserves their opportunity for consideration in the next Fire Training Academy under the holding of *FOP v. City of Cleveland.*

- 2003: The Ohio Police & Fire Pension Fund establishes the DROP program for members of Police and Fire Departments who are eligible to retire.  The DROP program allows Police and Firefighters who continue to work to have the equivalent of their retirement benefits paid into a special account that can later be withdrawn in installments or a lump sum.  The program requires a minimum three year commitment and is limited to eight years.  The net effect is that Police and Firefighters eligible to retire are given a powerful incentive to remain working.  As of June 30th of this year, 211 Cleveland Firefighters (all eligible to retire) are participating in the DROP program.

- January 2004: 70 Firefighters (all hired from the 1999 eligibility list) are laid-off due to severe budget crises.  Division of Fire is reorganized reducing the strength of the division from 976 to 906 members.

- January 2004 to April 2007: All Firefighters requesting return from lay-off are re-hired to fill vacancies in the Division of Fire.

- March 2008 to September 2008: Division of Fire meets with Public Safety and Civil Service to establish Fire Training Academy for the 2001 candidates and to plan for a 2009 Fire entrance exam to establish the second eligibility list.  Letters are sent in May 2008 to the 2001 candidates to determine their interest in attending the next Fire Training Academy.

(*Id.* at 2-4 (footnotes and emphasis omitted).)  Based upon these circumstances, the City argues that an extension is warranted, given that its "failure to meet the September 29, 2008 deadline for establishing the second and third Fire eligibility lists was due to circumstances beyond [its] control."  (*Id.* at 7.)

Several days later, on September 29, 2008, the Vanguards likewise filed a Motion to Extend the Terms of the Second Amended Consent Decree.  (ECF # 45.)  The Motion states that

the following terms of the Second Amended Consent Decree are at issue:

- The provision requiring that after expiration of the 1998 eligible list (for new hires), two additional eligible lists shall be created and hires made therefrom prior to September 28, 2008 (neither list has been created), unless and until the percentage of minorities in the Department reaches 33 1/3% (a percentage which has clearly not been reached).

- The provision requiring that the entire entrance examination process shall be reevaluated and revised following the establishment of the third such eligible list and prior to January 1, 2008.  (This was not done because it was not "ripe" due to the delay referred to in bullet point one).

There are other provisions of the second amended consent decree which have not been complied with, however these are not being addressed at this time (i.e. recruitment, the educational component, etc.).  The Vanguards reserve the right to address those issue at a later date.

(*Id*. at 4.)  Although the Vanguards "take issue with the City's statement of reasons and excuses," the Vanguards also seek an extension of time, so that the City can comply with the terms of the Second Amended Consent Decree.  (*Id.* at 4-5.)  In May 2009, the Vanguards filed a Memorandum and a Supplemental Memorandum in Support of the Motions to Extend the Consent Decree.  (ECF # 59, ECF # 60.)

On October 24, 2008, the CFFHP filed a response to the Motions filed by the City and the Vanguards.  (ECF # 50.) The Response provides that CFFHP:

generally opposes the City's motion for extension of time to comply with the Decree and Vanguard's motion to extend the Decree.  As the Parties know, the affirmative action consent decrees in this case are now well into their fourth decade.  The City's request would extend these matters into a fifth decade.  The CFFHP believes that this case represents the longest running judicial affirmative action decree in the entire United States.

(*Id*. at 1-2.)  CFFHP states that, as a result of extensive changes in the testing procedures, the need for the Second Amended Consent Decree is no longer present.  (*Id*. at 2.)  As such, CFFHP requests that the Second Amended Consent Decree "be permitted to expire as contemplated on

11

September 28, 2008, except for the provisions regarding future test advertising and recruitment

efforts and consultation regarding the composition of future tests and test scoring procedures."

(*Id.* at 3.)  On December 31, 2008, CFFHP filed an Amended Response, adding, *inter alia*, that

the minority make-up of the Cleveland Fire Department is in line with the racial makeup of the

City's general work pool and regulations for minority hiring in other professions.  (ECF # 53 at

2.)

On May 28, 2009, this Court held a hearing on the pending Motions, where the parties

presented evidence in the form of witnesses and exhibits. (ECF # 62.)  At the close of the

hearing, the Court granted counsel leave for post-hearing briefing on the issue of whether a third

amended consent decree should be allowed, provided that the submissions were made before the

Court-given deadline.  (*Id.* at 60.)

On June 8, 2009, the Vanguards filed a Post-Hearing Memorandum in Support of the

Motion to Extend the *Headen* Decree.  (ECF # 63.)  It provides:

> Following the May 28, 2009 hearing the parties continued their pre-hearing
> discussions and reached a firm consensus on a proposed stipulated order modifying
> paragraph one of the second amended consent decree.  In other words, the parties,
> for the reasons set forth in the attached stipulation and order, have resolved their
> differences and they submit the attached proposed order to the Court and request its
> adoption.

(*Id.* at 2 (footnote omitted).)  The proposed stipulation sets forth the following terms, in pertinent

part:

> 1.    Paragraph one of the second amended consent decree shall be modified to
>       read as follows:
>
>       IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:
>
>       The *Headen* decree shall remain in full force and effect until the City of

> Cleveland Department of Public Safety, Division of Fire, reaches a 33 1/3%
> minority makeup or until December 31, 2014, whichever comes first.
> Pursuant to Civil Service Rules, eligible lists are valid for two years.
> Pursuant to this Stipulation and Order, the City is required to have no less
> than one new eligible list established and appointments to any existing
> Department vacancies made therefrom before December 31, 2014.  For these
> purposes, the percentage makeup of the Division of Fire shall be computed
> by determining the percentage of minorities (as determined by the decree)
> within the uniformed ranks of the Division of Fire, regardless of rank.

> 2.    The date of September 29, 2008 in paragraph eight (8) shall be changed to
> December 31, 2014.

> 3.    All remaining provisions of the second amended consent decree shall remain
> in full force and effect with the exception of the following:

> a)    The option of continuing the recruitment and training programs
> referenced in paragraph two shall be available to the City without
> further order of Court; and

> b)    The attorneys fees provision of paragraph four is deleted without
> prejudice to the claims by the CFFHP and/or the Vanguards, should
> they be tendered, for attorneys fees and expenses.

(*Id.*, Ex. 1 at 3-4.)  Thus, the Vanguards urge the Court to extend the Second Amended Consent

Decree.  (*Id.* at 1.)

On June 11, 2009, CFFHP filed a Post-Hearing Memorandum.  (ECF # 64.)  CFFHP

states that:

> in light of the extension language in paragraph one of the Second Amended
> Decree, the circumstances that have occurred since that Decree was entered
> into, and the uncertainty of this litigation, the adoption of [the] Stipulated
> Order is in the best interests of the public and all Parties to this case.  The
> adoption of the Stipulated Order would avoid further contentious and
> expensive litigation, assist with restoring harmony among the members of the
> Cleveland Fire Department, permit additional appointments to the
> Department to be made as planned, and bring the Decree to a definitive and
> final conclusion by the end of 2014.

(*Id.* at 2.)  Hence, CFFHP requests that this Court adopt the proposed Stipulation and Order, and

13

it withdraws its opposition to the pending Motions.  (*Id.*)  Alternatively, CFFHP argues that, if the Court declines to adopt the agreed upon Stipulation and Order, the Motions should be denied. (*Id.* at 3.)

On the same day, the City filed a Post-Hearing Memorandum.  (ECF # 65.)  The City also urges this Court to adopt the proposed Stipulation Order.  (*Id.* at 5.)  The City suggests that the proposed Stipulation and Order is appropriate because it has "a firm sunset date of December 31, 2014 and a requirement that the City produce *at least* one eligibility list."  (*Id.* (emphasis in original).)  The City suggests that, because the agreement by the parties provides an end to the *Headen* decree and contains a narrowly tailored remedy, the Court should adopt the proposed Stipulation and Order.  (*Id.*)

This Court held a status conference in this matter on June 29, 2009.  (ECF # 68.)  At the conference, the Court informed the parties that the proposed Stipulation and Order was unacceptable.  (*Id.* at 1.)  The Court granted the parties leave to file a new proposal and indicated that, if no such proposal was filed, it would rule on the pending Motions.  (*Id.*)  On July 2, 2009, the Vanguards filed a status report, indicating that "they will not withdraw their approval of the stipulation and proposed order."  (ECF # 70.)

Accordingly, the Motions have been briefed fully and the matter is now ripe for determination.

## II. DISCUSSION

In the 1970s, when the Consent Decree was first put into place, blacks accounted for a mere 4% of the firefighters in the City's Fire Department, but consisted of 40% of the population living in the City.  The evidence presented in this matter before the two District Court Judges

preceding the undersigned District Court Judge reflected that the hiring practices and statistical disparities of the 1970s caused a near total absence of opportunity for minorities in the City's Fire Department.  Hence, at that time, the Consent Decree was implemented as a temporary measure, designed to remedy the then-present and past discrimination.  This nation, and the City of Cleveland, have come a long way since then.

The foundation of this case is intricately woven into the very fabric of this nation's history concerning race relations.  Not long ago, this Court was called upon to examine similar issues in the case of *Rutherford, et al. v. City of Cleveland, et al.*, 1:94 CV 1019.  *Rutherford* arose from two previous actions filed in this Court by the Shield Club, an organization composed primarily of black police officers who represented the interests of minority officers and applicants for police officer positions.  In 1972 and 1977, the Shield Club, along with individual minority plaintiffs, filed a complaint against the City and other defendants.  Those cases were consolidated and are collectively referred to as "the *Shield Club* cases."

In *Rutherford*, this Court provided the following background:

> The issues in this case focus upon the American human experience of the history of race relations in the City of Cleveland and the United States, the evolution of law, and the fundamental right of the poor, the powerless, and the victims of racial discrimination to have their grievances heard fairly and impartially by a judge in a court of law.  The long and tumultuous struggle for racial equality in the United States often resulted in anger, frustration, disappointment, and all too often, bloodshed.  The Civil War was fought and won, in part, so that all Americans could live in freedom.  Victory came only after tens of thousands suffered and died.  The Fourteenth Amendment to the Constitution was ratified in an attempt to afford all Americans equal protection under the law.
>
> The struggle for freedom and equality continued on the streets with American pitted against American. Cultural and philosophical differences led to violence. Cities erupted in race riots throughout the United States. Champions of freedom and equality, the Reverend Martin Luther King and Senator Robert Kennedy, were assassinated to silence their voices.
>
> It is with this historical background of the American human experience that

15

the Shield Club, a small group of minority Cleveland police officers, came to a
federal court on October 12, 1972 . . . and filed this action alleging widespread,
systematic, and intentional racial discrimination throughout the Cleveland Police
Department regarding hiring, transfers, and promotions.  The new battleground to
achieve equality and freedom had become the federal courts.

By the time judicial findings were made in this case, the United States
Supreme Court had made it not only the law of the land that racial discrimination in
the hiring, transfer, and promotion of candidates violated the Constitution, but also
that District Court judges had the duty to develop and implement remedial measures
designed to end such discrimination.  Judges were required to fashion these remedies
based upon the facts and circumstances unique to the case before the Court.  Little
additional guidance was given by the Supreme Court in the beginning.

The remedial measures developed and implemented by District Court judges
certainly had an enormous impact in ending much of this discrimination, and they
offered opportunities to minorities which had previously not existed.  These new
opportunities for minorities came at both a real and a perceived cost to affected non-
minorities.  The remedial measures often resulted in the loss of opportunity for non-
minorities.  This loss, however, the Supreme Court repeatedly stated, was an
acceptable price to pay in order to remedy past and present discrimination.

*Rutherford v. City of Cleveland*, 1:94 CV 1019.  *Rutherford*, which began many years prior with

minority police officers claiming intentional discrimination in the *Shield Club* cases, was before

the Court upon the claims of several hundred non-minority candidates alleging intentional

discrimination by the City of Cleveland against them.

In order resolve the issues in *Rutherford*, the Court first looked back to the findings in the

*Shield Club* litigation.  In *Shield Club*, not unlike this case, the parties entered into an Amended

Consent Decree, which set forth a remedial plan design to counter past discrimination against

minorities in the Police Department's hiring practices.  Among other things, the Amended

Consent Decree required the City to hire three qualified minority candidates for every four

qualified non-minority candidates who were hired to the position of police officer.  If, in any

given year, there were not enough qualified minority candidates to meet this requirement, the

City would have to offer another exam in order to qualify additional candidates so that the City's

16

hiring requirements could be met without violating the terms of the Amended Consent Decree.

The Amended Consent Decree provided that, in choosing which qualified candidates to hire, the City could utilize "the one in three rule."  The one in three rule allowed the City to certify the top three candidates on the eligibility list for consideration and to appoint one of those three persons for a job opening.  Those not appointed stay on the list in their rank order and are considered again, along with the next highest ranking candidate, for the next opening.  If a candidate has been certified and not chosen more than four time for the same or similar position, they may be removed from the list.

The Amended Consent Decree was terminated on May 15, 1995, on the unopposed motion of the Fraternal Order of Police.  The Court found that, as of June 16, 1994, the minority representation on the police force had reached 33%, which met the goal of the Amended Consent Decree.  Thus, the Court found that it had expired by its own terms.

In *Rutherford*, the plaintiffs alleged that they were all removed from the eligibility list, mostly claiming that their removal was based on being passed over four times under the one in three rule.   In October 2000, this Court issued a Memorandum Opinion and Order finding that the remedial provisions in the Amended Consent Decree passed strict scrutiny and thus did not illegally deprive the non-minority applicants of their Equal Protection rights under the Constitution.  Accordingly, the Court found that the three out of seven hiring goal, the separate eligibility lists used to implement the one in three rule, and the three in one rule itself were constitutional.  The Court likewise found that it was constitutional for the City to offer a new eligibility test if there were not enough qualified minority candidates to fulfill the hiring goals. The Court reached the same determination in an August 2004 Memorandum Opinion and Order,

reiterating that the provisions in the Amended Consent Decree were a constitutionally viable means of redressing past discrimination against minorities in the hiring of Cleveland police officers.

In making this determination, however, the Court was mindful of the impact on non-minorities.  It stated:

> Although the Court is sympathetic to all those non-minority individuals who believe they have been subjected to discrimination on the basis of their race, our society and, more importantly for the obligations of this Court, the [United States Supreme Court has] determined that a limited and temporary imposition of "reverse" discrimination or "affirmative action" was a necessary step toward creating greater equality for all.  The use of affirmative action will always place a burden on non-preferred third parties.  This burden is even harder for affected individuals to accept because, as we are unable to go back in time to directly remedy the wrongs of the past, the burden of this repair must be shouldered by individuals who, in many cases, have not only reaped no direct benefit from the prior discrimination, but also find themselves personally victimized by discrimination on the basis of their race.  Although regrettable, this sacrifice has been deemed to be an acceptable allocation of social responsibility in the context of counter-balancing the insidious race discrimination of the past.
>
> The experience of the Great American Experiment – a government for the people, by the people, and of the people – may cause future generations to look back and wonder how law promulgated by the United States Supreme Court could have allowed innocent Americans to be legally discriminated against based upon their race.  Whether future interpretations of the law by the Supreme Court will continue to accept the principle that in "this situation" the end justifies the means, is a question that will only be answered in the future.  For now, however, this Court is bound to follow the law as it exists today.

Taking into account its prior determination that the terms of the Amended Consent Decree were constitutional, and finding that Plaintiffs failed to present any evidence of racial discrimination independent of those terms, the Court dismissed Plaintiffs' claims.

The United States Court of Appeals for the Sixth Circuit affirmed this Court's decision. *Rutherford v. City of Cleveland*, No. 04-3904, 2006 WL 1526091, at *1 (June 1, 2006).  In doing so, the Sixth Circuit examined, *inter alia*, the duration of the race-based remedy contained in the

18

Amended Consent Decree, noting that courts "view with disfavor those affirmative action plans that are not temporary and do not terminate when racial imbalances have been eliminated."  *Id.* at \*12.  Because it found that the remedy in the Amended Consent Decree was not intended to be long-term or permanent, given that it contained a flexible, self-executing sunset provision, the Sixth Circuit found it narrowly tailored to accomplish a compelling government interest.  *Id.*

Although the background giving rise to the remedial measures at issue in *Rutherford* and the instant case are substantially similar – indeed, the patrolman's examination and the firefighters examination were identical and judicially determined to be in violation of the equal protection clause – the agreed upon remedy differed.  In *Shield Club*, the parties sought to reach 33% representation by, *inter alia*,  requiring the City to hire three qualified minority candidates for every four qualified non-minority candidates who were hired to the position of police officer. Using this approach, the Amended Consent Decree was terminated on May 15, 1995, because the minority representation on the police force had reached the 33% goal, causing the Amended Consent Decree to expire by its own terms.

This case had the similar goal regarding minority representation, and the Second Amended Consent Decree provided that it was to remain in full force and effect until the City reached a 33 1/3% minority makeup, or until the City has established and hired cadets from three eligible lists, whichever occurred first. Unlike the Amended Consent Decree at issue in *Rutherford*, however, the Second Amended Consent Decree did not adopt a requirement that the City hire three qualified minority candidates for every four qualified non-minority candidates. Even absent such a requirement, the record reflects that the City's efforts have resulted in substantial compliance with the stated goal of 33 1/3% minority makeup.  In 2000, Judge Manos

found that 26% of the City's firefighters were minorities, a significant increase from the mere 4% that was cited by Plaintiffs at the outset of this case. This clearly constitutes substantial compliance with the arbitrary, aspirational goal of 33 1/3% minority representation in the Fire Department set by the Court and parties in the multiple Consent Decrees.

The question then arises why, more than fourteen years after the Amended Consent Decree was terminated in *Shield Club*, is this Court being asked to once again extend the terms of a consent decree that has roots dating back to the 1970s.  In its briefs as well as at the hearing in this case, the City has produced substantial evidence demonstrating that it extended its best efforts to achieve the hiring goals in the Second Amended Consent Decree.  Indeed, the record reflects that all parties used their best efforts to produce dynamic change and, for this, the parties should be commended.  By all accounts, the City has devised and implemented a plan for the recruitment of minority firefighter candidates, including but not limited to, programs at the Martin Luther King High School and in the Cleveland Municipal School District, designed to increase interest in pursuing a career in firefighting.  (ECF # 62 at 20.)  Yet, emblematic of all the of the circumstances that have prohibited the City from reaching the goals in the Second Amended Consent Decree, is the fact that the City has not been able to hire a single person emerging from those programs.  (*Id*. at 25.)

The record reflects that changes relating to, among other things, this nation's declining economy have taken place, which could not have been anticipated at the time that the Second Amended Consent Decree was entered into.  The firefighters last hired were from an eligibility list that is now a decade old, the last fire academy was held in 2001, layoffs followed thereafter, and the DROP program caused a substantial number of firefighters who would have otherwise

retired to continue in their current positions.  These circumstances were all unforeseen and, hence, despite a good faith effort, the City has not satisfied the goals in the Second Amended Consent Decree.

Given these ongoing economic circumstances, this Court is faced with the decision of whether it should allow the Second Amended Consent Decree to continue in a modified form or to allow yet a Third Amended Consent Decree, some 37 years after this case was filed.  The Second Amended Consent Decree contemplated the possibility that the goals therein may not be met, noting that there may be legitimate circumstances which may prevent establishing and hiring from two additional eligible lists within the prescribed time.  In particular, the Second Amended Consent Decree provided that, if the City was unable to establish three lists, including the 1999 eligible list, and hire therefrom before September 29, 2008, it could petition the Court for a reasonable extension of time.

The ramifications of the Court's decision in this matter extend well beyond the City's Fire Department as presently constituted, reaching everyone from pools of potential applicants for the position of firefighter to the very residents who rely upon the City's firefighters for their safety.  In administering justice in this case, this Court seeks fairness for everyone, regardless of race.  As such, the Court must examine whether a bona fide job-related examination that is nondiscriminatory could satisfy the goals set forth in the Second Amended Consent Decree, absent continued Court intervention.

This question is not dissimilar to one arising recently before the United States Supreme Court.  On June 29, 2009, the Supreme Court examined a difficult question arising in employment discrimination law in the matter of *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009).  In

that case, the plaintiffs were white firefighters and one hispanic firefighter, who sued the city of

New Haven, Connecticut and city officials for an alleged violation of Title VII.  The case

syllabus provides:

> New Haven, Conn. (City), uses objective examinations to identify those firefighters
> best qualified for promotion.  When the results of such an exam to vacant lieutenant
> and captain positions showed that white candidates had outperformed minority
> candidates, a rancorous public debate ensued.  Confronted with arguments both for
> and against certifying the test results – and threats of a lawsuit either way – the City
> threw out the results based on the statistical racial disparity.  Petitioners, white and
> [h]ispanic firefighters who passed the exams but were denied a chance at promotions
> by the City's refusal to certify the test results, sued the City and respondent officials,
> alleging that discarding the test results discriminated against them based on their race
> in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964.  The defendants
> responded that had they certified the test results, they could have faced Title VII
> liability for adopting a practice having a disparate impact on minority firefighters.
>  The District Court granted summary judgment for the defendants, and the Second
> Circuit affirmed.

*Ricci v. DeStefano*, 129 S. Ct. 2658, 2661  (2009).  In reviewing the issue, the Supreme Court

held that the City's action in disregarding the tests violated Title VII.  *Id.*

The Supreme Court began its analysis with the premise that the City's actions violated

Title VII's disparate-treatment prohibition absent some valid defense.  *Id.*  That is, because the

evidence demonstrated that the City rejected the test results on the basis that the higher scoring

candidates were white, without some other justification, the race-based decision-making was

prohibited.  *Id.* at 2662.  Applying the strong-basis-in-evidence standard, the Court found that the

exams at issue were job related and consistent with business necessity.  *Id.*  The Court found

that, not only did the City turn a blind eye to evidence supporting the exam validity, the

Respondents lacked a strong basis in evidence showing an equally valid, less discriminatory

testing alternative.  *Id.* at 2663.  The Court ultimately found that fear of litigation alone could not

justify the City's reliance on race to the detriment of individuals who passed the examination and

qualified promotions.  *Id.*  As such, it held that discarding the test results was impermissible under Title VII.  *Id.*

As in *Ricci*, what is integral here is the administration of an examination, as part of an overall hiring process, that is fair to all people – regardless of race. The Supreme Court's decision in *Ricci* reminds us of how far we have come from the origination of affirmative action in 1960s.  Places such as the Cleveland Fire Department, which were virtually all white, now more closely mirror the population within the City.  Progress has been made, but the judiciary continues to struggle to find the proper balance to ensure equal opportunity between minorities and non-minorities alike.  *Ricci* calls to mind what this Court noted in *Rutherford*, that its decision with respect to the necessity or propriety of race-based remedies has a wide-ranging impact on everyone's lives, regardless of the color of their skin.

The fact that the Second Amended Consent Decree allows for an extension does not mean that this Court is bound to grant it.  To the contrary, this Court may, in its discretion, decline to extend the duration of the Second Amended Consent Decree if it determines that it is unnecessary for the Court to continue to monitor the hiring process in the City's Fire Department. Federal court intervention, and the Second Amended Consent Decree by its nature, are temporary measures that should extend no longer than necessary.

The United States Supreme Court examined the issue of long-standing consent decrees recently in *Horne v. Flores*, No. 08-289, slip op. (June 25, 2009).  There, the Supreme Court recognized that long-standing consent decrees are not immune from reexamination, stating that "[i]njunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative

23

and executive powers." *Id.* at 12 (internal quotations omitted).  It stated that, "Scholars have noted that public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.* at 11.  As such, this Court is not constrained to extend the terms of the Second Amended Consent Decree simply because it inherited the long-standing agreement.  *See id.* at 11-13.  Rather, this Court must critically examine the request before it, with particular attention to whether Court intervention remains necessary.  *See id.*

As the Movants in this instance, the City and the Vanguards have the burden of demonstrating that the *Headen* decree should remain in effect until the City satisfies the 33 1/3% minority makeup or until December 14, 2014.  Based upon all of the evidence before it, the Court finds that they have failed to meet that burden.  Although the parties cite the validity of the proposed extension, the Court has made them aware that it calls for a period of monitoring too lengthy, given that the controversy began several decades ago.  The Court granted the parties leave to file an alternative proposal, and the parties failed to do so.  As the Court indicated in the June 29, 2009 status conference, the proposed extension of the Second Amended Consent Decree to 2014 is unacceptable.  That would be 41 years since this case was filed in this Court.  And, it is true that no one that would be affected by the intervention of this Court would even have been born at the time the case was filed.

The history of this case makes clear that past injustices indeed existed in the City of Cleveland with respect to the hiring of minority firefighters.  However, the Court has found that the City has made a good faith effort to comply with the remedy designed to right those wrongs. The evidence demonstrates that it was not the City's lack of effort, but rather circumstances

24

beyond its control, that resulted in it falling short of satisfying the goals in the Second Amended Consent Decree.  Based upon the evidence relating to the pending Motions, the Court finds that judicial monitoring is no longer a necessity.

Although some may argue that, absent Court intervention, the City may revert back to the practices that gave rise to the original Consent Decree many years ago, there exists nothing in the record to suggest discriminatory practices will resume.  A review of the City's good faith effort to comply with the Second Amended Consent Decree reflects that the City currently has in place a foundation that will lead to increased minority representation in the Fire Department once the economy allows for a more routine hiring process to resume.  Using a bona fide job-related examination that is nondiscriminatory and continuing with its minority recruitment efforts, qualified minority candidates will have continued success in the hiring process, and the Court is confident that diversity within the Fire Department will continue.

In addition, while these Consent Decrees did not quite meet the arbitrary goals set by the parties, they certainly created a framework that allows the City to establish a hiring procedure and process that is nondiscriminatory and fair to ALL applicants – thereby assuring the citizens of Cleveland that the most qualified applicants are selected, and assuring each candidate that he or she will be selected on the basis of merit, rather than on a judicially-sanctioned race-based formula.

Based upon the foregoing, the City's Motion for Extension of Time to Comply with the *Headen* Decree (ECF # 44) and the Vanguard's Motion to Extend the Terms of the Second Amended Consent Decree (ECF # 45) are DENIED.

**III. CONCLUSION**

For the reasons cited herein, the City's Motion for Extension of Time to Comply with the

*Headen* Decree (ECF # 44) and the Vanguard's Motion to Extend the Terms of the Second

Amended Consent Decree (ECF # 45) are DENIED.  This case is TERMINATED.

IT IS SO ORDERED.


                                        *s/ Donald C. Nugent*
                                        DONALD C. NUGENT
                                        United States District Judge

DATE August 20, 2009

26